Please call the rise. Hear ye, hear ye, hear ye. This Honorable California Court of Second Judicial District is now back in session for a suit to adjourn. The Honorable Mary S. Tronstad, the presiding judge. Morning, gentlemen. You can be seated. Good morning. Your Honor, this case on the docket is a two-fact, fifteen-fact, two-five, three-zero. C. E. Design Ltd., Aldo Signing and Display Company, 157th. The Continental Casualty Co. is owned by the Board of Insurance Companies. The National Flag and Terms Company of Parker. In the case of Flight 185C, the defendant is at the loose. I do not have the plaintiff's appellant. Attorney Mr. Jeffrey Berman. I do not have the plaintiff's athlete. Attorney Mr. Barrett. Right side. Mr. Berman. Thank you, Your Honor. May it please the Court. My name is Jeffrey Berman. I'm here today on behalf of your appellants. They say that timing is everything, and never has that been more clear than in the context of this case. This is a much different case than when it began. It's even a different case than when the appeal process began. And I think this Court is aware of why that is. At the outset of the litigation, the prevailing landscape, based primarily on trial court's decisions, was that claims for conversion based on unsolicited faxes, even in the context of an insurance policy that had a TCPA exclusion, triggered a duty to defend. This Court's decisions in GM Sign v. Shane, and later GM Sign v. State Farm, were rendered while this case was pending below. And as this Court is aware, our client has a fundamentally different philosophical perspective on the nature of those cases, because we were involved in them, and on the application of duty to defend jurisprudence in Illinois. But as I stand here today, I think it's essential that I acknowledge that while this appeal has been pending, this Court has further clarified its decision in GM Sign. And in doing so, it rejected the arguments that we have proffered in this case prior to the decision in Illinois Casualty v. West Dundee. And while that is an unreported decision, we take due note of that and its impact on the likelihood of success on the arguments that we have made in this case. I think it is reported. Oh, I'm sorry. I was thinking of a different case. You're right. It is. I stand corrected, Your Honor. That is correct. And it's undeniable that we would love to see the Court revisit the question, but we're also realistic. We understand this Court has made its decision on those issues, and that while we believe it's essential to preserve our position, I'm not here to argue to you that those cases don't exist or to deny what they say. So then you were hanging your hat on the first issue. I mean, obviously, you're acknowledging that the policy has ostensibly had the exclusionary language, but as I understand your briefing argument here, is that those exclusions should not apply because the Texas Department of Insurance didn't approve them? Is that sort of the gist of one of your arguments? That is the gist of one of the arguments. That's correct. The primary thrust of the case when it began was that the exclusion, whether it was properly in the policy or not, didn't control because of the conversion count and the fact that the exclusion didn't apply to the conversion count. They should have defended. They failed to defend. Mr. Justice Burke and others have made it clear to me that my reasoning may not be... May not be sufficient. Exactly. And so I don't want to... Have any PLAs been taken? I'm sorry? Have any PLAs been taken from any of these cases? No. The Shane PLA was denied, as was the Illinois Casualty case. So there's no reason for me to suggest to you today, other than I would ask the Court to again look at the question in light of the history of jurisprudence in Illinois and some of the recent cases. And we cited them in the reply brief. And I don't want to belabor the point, but we cited Country Mutual Insurance Company v. Bible and Pork, which is a Fifth District case, and then a decision authored by Justice Shostak in Perry v. Fidelity, 2015, 11-2-150168, which dealt with the issue of what you do when you have an unclear allegation or an unclear complaint when you're dealing with the duty to defend. And in that case, the Court reversed the trial court's determination that there was no duty to defend. We think that it warrants a look, but we understand. And I don't want to incur the wrath. Justice Burkett was here at the last time one of these cases was argued, and he made it very clear that he didn't agree with the arguments and I'm not here to repeat them today. And so that's why I felt I needed to stand up here and make it clear to you because the briefing predated the Illinois casualty decision, why those arguments were made and it wasn't done to antagonize the Court. So how do you anticipate then proceeding to the point where you feel there should be a duty to defend? Okay, well, that's a nice segue, Your Honor. The second argument that is made in the brief talks about whether or not the exclusion is properly part of the policy. And the burden to prove that the exclusion is part of the policy and that it unambiguously applies to preclude coverage rests with the insurer. And we talk in the brief a lot, but it boils down to this. The insurance companies tender a witness as a corporate representative to make admissions on its behalf. And that representative testified that there were two steps to the process. One is that the form must be filed with and approved by the Texas Department of Insurance. And then there must be a second step taken, a reference filing, to get an initiation date for the use of the form. If those steps were not taken or not proven to have been taken, it is our position that the form was not properly used, didn't become part of the policy, and then there's, as the trial court put it, a layered argument that follows. But let me start with the first part. Where an insurer attempts to use an unapproved exclusionary endorsement under Texas law, the endorsement is void and unenforceable. That was the holding in Commercial v. Preston and Mutual Life Insurance v. Daddy's Money. Those are both cited in the briefs. And there's at least an issue of fact as to whether or not these insurers properly complied with the process in Texas, and therefore whether they may properly rely on the exclusion. As I said, they're burden-proof, and respectfully, we believe they haven't met it. You're arguing that they didn't meet both approvals. I mean, there had to be two approvals, one generally and then one specifically for that company, correct? Correct. And you're arguing that they didn't meet either of those. We believe they didn't meet. They didn't prove that they met them. They tried to, and I concede that we had an odd process below. We took the deposition to Mr. Lord. There were, we'll call them, gaps in the testimony. Certainly we both agreed on that because they tendered another witness to try to fill in those gaps, and their second witness, Ms. Wilson, did in fact testify that they had a contract with ISO and that insurance service office, I don't mean to use the abbreviation wrong, defining it, and that that contract covered the time period in question and covered the companies in question. So Charles Lord handled the approval of the forms is basically what? Basically that was the purpose of his testimony was to show that they had, in fact, complied with the regulatory process, and he identified the two steps. And then as we got into that deposition, it was clear that he didn't really know anything specific about ISO. He just had heard that they were members of ISO, and he had heard that ISO handled the filing, but he didn't know that, and he didn't have either personal or corporate knowledge. And then Ms. Wilson came in. Who presented the ISO circulars, him or Wilson? He brought the circulars in. To show the approval of this exclusion. That was the purpose. The purpose of the circulars were this is the documentary evidence that we have to show that ISO filed the form in Texas and what they relied upon. And what we've argued below and believe is appropriate here is that those circulars don't actually accomplish the purpose for which they were tendered, and his testimony is entirely based on those circulars. He had no other corporate or personal information, and what he said was the circulars say ISO did it, if I can be colloquial in saying it. But that isn't actually proof that it happened. And, you know, what kind of gets glossed over in the briefing here, and I noticed that last night I think a little bit, is that the insurers didn't seek to introduce any testimony or specific records either from ISO, somebody from there saying, hey, yes, I attest that we did this, or from the insurance office in Texas who could have with one certification cleared up the whole issue by saying, yes, we received these forms, and yes, we received the supplemental filing to get the implementation date so that it was appropriate for these insurers to use these forms in Texas. What's the effect of this CERF document that was approved? Well, the CERF document exists for a different policy form, but in fact what happened is it came out at the deposition that the witness and counsel, Mr. Brightman was there at the deposition, had made a search for the specific documents, whether either through CERF or otherwise, that would have gotten them the implementation date and found no such records. And they were unable to provide us with any documentation that showed that what they believed happened actually happened. Now, let's assume that's true for the sake of the argument that there's a lack of the secondary approval making the whole form unapproved. Let's assume that that is the case. Does it make the form voidable or void? Isn't there a difference? Yes, there is. And there's actually a distinction in the case law draws because you don't want a situation, the Texas cases that were discussed by both sides, you don't want a situation where you say, okay, they didn't get the proper form approved, so now the insured has no coverage whatsoever because the whole form goes poof. The good thing about this case from our perspective is that's not what we have here. You have a policy form that provides the coverage and the basic terms of coverage, and you have a separate endorsement form in the early years, and we'll get to the later policy in a minute. But in the earlier years, the exclusion is a stand-alone form. So if the court deems that to be void or voidable and construes the policy in favor of coverage, which we believe is the appropriate result under Texas law, you have initiated coverage. You've just taken away the ability of this insurer to use that exclusion to avoid the coverage that otherwise is provided by the policy. In the event that their exclusion is separate, not the one that's integrated into the policy. Correct. You're talking about it separate. In the first one, it's separate. Yes, it is. It's a separate exclusion form. The second policy, the second general policy, it's in the policy itself. Correct. That's a different basic policy form. Same exclusion, though, right? Essentially the same exclusion. That's correct. Same language. Yes. Yes. And we're not arguing that. Does the stand-alone exclusion on the 0809 policy, was that by reference incorporated into the policy itself? I want to make sure I'm answering your question. I believe it's listed on the declaration page as a part of the policy. So if that's the response. So why is it standing alone? I mean, my question is, don't we read the entire thing together? I mean, you want to say that the policy is good because, of course, you want coverage. You don't want to rescind, not you, but King, doesn't want to rescind coverage. They want the coverage, but they don't want the exclusion. That's what you're arguing. Correct. So you're excising out this form exclusion that was attached, but if it's incorporated in and read into the policy, what's the difference between the first policy and the second policy? Because what we're talking about is whether a form is void. So in this case, the form that we're arguing is void is a one-page document that says this endorses to the policy an exclusion that isn't otherwise in the policy. And therefore, it is not. Yes, you read it as a whole, and I understand that argument. But at the end of the day, this is a separate document that was appended to the basic policy form separately, and it's listed on the declarations page as additional forms and endorsements. It's not the policy form because that's a CGL policy form, 0001, the basic ISO form. Okay. So then how are you treating that one, the one that is excised, if you will, from the actual document? How are you treating that differently than the one where it's incorporated into the document? We are not arguing that the policy form itself in the late 2009, 2010. I'm going to get my dates messed up because I don't have them in front. We're not arguing that that policy form wasn't approved or that it is void. What we are saying is that there's a different argument that applies to that policy, and that's the reduction in coverage argument. Under both Texas and Illinois law, when you change the terms of the coverage to reduce the amount of coverage available to the insurer, you have an obligation to give them specific affirmative notice of the change in coverage. That didn't happen between the 2008 and 2009 policy. Now, I can hear the wheels turning. Yes, it was in the prior policy, but the insurer doesn't know that that policy form wasn't properly appended to the coverage. So once you get to the point where you say in the 2008, 2009 policy, exclusion doesn't exist for that policy, now when you go to the 2009 policy, having that exclusion in there is a reduction in coverage for which there was a need to advise the insurer. Now, my worthy opponent will say, but they didn't know it was a reduction in coverage or they thought it was a continuation of the same terms. I understand that, but by operation of law, the 2008 policy didn't have the exclusion because it wasn't properly processed by the Texas Department of Insurance, or at least they haven't proven it, and they should have, and we should go back and have them prove that. So if we find that the 2008, 2009 was properly approved, then game is off? Yes. I see a ring of bells. Have you found any approved Texas Department of Insurance approved forms or approved provisions in forms that directly conflict with this add-on exclusion to the 2008, 2009 policy? If I understand that question correctly, the answer is no. Then why doesn't this EURESIA case dispose of this argument against you in that since it doesn't conflict with an approved form, it's still okay? I think that that would be an over-reading of EURESIA, and that really EURESIA involved a circumstance where the form was an additional insured endorsement which extended coverage. And so what the court there said was we don't want to make a decision that results in killing the coverage, officiating the coverage, and so we're not going to apply the rule that was established in the earlier cases, including Daddy's Money, which actually went in the direction that we're talking about. And the reason that that case simply doesn't apply is to avoid the insurance provision under these circumstances would penalize the innocent insurer of not providing more protection. That's a quote from the case. In this circumstance, it's more closely aligned with Daddy's Money. To remove the endorsement from the policy would not penalize the insured and would provide the insured with more coverage, in line with the policy that underlines both decisions, which is that we don't want insurers to make changes in coverage and to do things without having properly approved forms and without giving proper notice. But again, if this was voidable and we read the whole thing together, the insurer has the ability to rescind the entire policy under EURESIA because they discuss in EURESIA the insured not being allowed to take the good and leave off the bad. Either you're going to avoid this thing or you're not going to avoid it. But again, maybe you're going to argue that that's too broad a reading of EURESIA. I don't know. I think it is, Your Honor, with respect. And I understand the point, and certainly that language is in that opinion, not denying it. But I think if you read the case as a whole, their point was, we're not going to apply this rule formulaically, and we're not going to apply it in a situation where it costs the insured its coverage because that makes no sense on a policy level. And it didn't overrule daddy's money or the earlier cases. It left that rule in place, and that really controls here because it says, if you don't do it, the Pottery Barn rule, if you broke it, you own it. If you didn't do it right, then you're not going to get the benefit as an insurer of a provision that vitiates coverage, and that's what went on here. Your time is up, and you're going to have a few minutes in rebuttal. Thank you very much, Your Honor. All right. Thank you. Thank you, counsel. Is it Breitong? Breitong, yes, ma'am. May it please the Court, I am Barry Breitong, and I represent the appellee insurers in this matter. I was going to say that I think there are really two issues before this Court, not that there might be just one. The first issue was that this Court's own GM sign is controlling on the scope of the violation of statutes exclusion or the TCPA exclusion. He was going to tacitly and expressly acknowledge that, so. Yeah. The second issue, which I'll call the reference filing issue, is that insurers failing to perfect a purely administrative, under Texas law, what's called a reference filing to the Texas Department of Insurance, or what I'll call the TDI, should somehow void the violation of statutes exclusion on the first primary policy, 2008-9, which I'll just call the first primary policy. Those are the two issues. I think I can save the Court some time on the first issue. Why don't you address the second issue? I think that the trial court clearly found that there was no approval after TDI. Well, there was approval. But was there through ISO? With respect to the first primary policy, 2008-9, what is not in dispute is that the ISO, Insurance Services Office, submitted the multi-state violation of statute form to the TDI for approval in 2004, and in 2005 the TDI approved it. That is not in dispute. And that was a subject of Mr. Lord's testimony, especially with respect to the five ISO circulars that track that process for subscribers to ISO. ISO submits these forms of the address of subscribers to all state insurance agencies. And this is the 08-09 where it's separate. The exclusionary policy is separate. It's a one-page endorsement. So addressing that issue, the entire primary policy itself in that year is about 200 pages, and just the CGL portion looking at the exhibit in the appendix itself is 65 pages. Now, it's true that the liability form is only 14 pages, and everything else are endorsements to that policy. So I think counsel was trying to say that this is sort of a standalone endorsement, not really part of the policy. It's all the primary policy. It all has the same legal effect. It was issued as a package. So there's no difference between the single-page endorsements or all the many other endorsements on that policy, and the 14-page policy wording itself. It's all the primary policy. Now, the ISO circulars, as the court found, in particular the ISO circular dated June 28, 2005, is the one that announced to the subscribers that TDI approved this filing, which means it approved the violation of statute endorsement. There's no doubt about that. Mr. Lord, in his deposition, identified that of the five. This is the one that says the TDI approved. Let me ask you quite a question. The opposing counsel made an argument that, obviously, the Lord's testimony wasn't worth anything because he admitted not having any knowledge of this personally. What's your response to that? Which person? I'm sorry. The process you mean? The Lord was testifying about the circulars, but then I believe he alluded to the fact that upon cross-examination, he sort of admitted he really had no personal knowledge of this. He was relating what he heard, according to counsel. Well, first of all, he wasn't testifying as a personal witness. He was testifying as a corporate witness. And so personal knowledge, as we argued, is not crucial. In fact, it goes against the grain of what a corporate witness is supposed to testify about, the knowledge of the corporation put into that person. So whether he was personally involved in this process is meaningless. He testified, as far as we can recognize, on the process, how ISO works, how the circulars work, how the circulars are the records for the ISO subscribers from ISO. And I think there were no gaps in his testimony at all. He was very clear on this, as the trial court found. How hard would it have been to get a certificate from TBI to say that this is when we approved the form generally, the form exclusion generally, and this is when we approved it specifically for a date for Valley Forge to start using? Well, we searched our records with respect to the first primary policy, and I'll get into what a reference filing is. It's a very pro forma administrative filing, and we cannot find that we get it with respect to the 0809 endorsement. Now, as counsel said, in the next policy, that was the first year that the endorsement was brought into the wording, and our exhibits include not only five other ISO certificates for that, but a reference file. And just to address, what is a reference file? It is a, as identified by the Texas Admin Code, 5.93105, it is just a filing that references the use of policy forms or endorsements that TBI has approved, adopted, or accepted. And that's a crucial line. You can only make a reference filing with respect to forms that the TBI has already approved. It's strictly pro forma. Texas Admin Code Rule 5.932 says you just need two things to make a reference filing, the name of the insurance company filing and the TBI filing number, so they know who you're referring to. That's it. There is no statutory support for the proposition that an insurer's failure to make a reference filing on an approved form somehow voids that form. There is no Texas case law support for that proposition. In fact, there is no Texas case law addressing reference files whatsoever. The ERISA and the other cases that insurers cite, the FINA Oil and the Chicago Bridge, those cases are all cases in which, sticking with ERISA, that unapproved endorsements or policy forms, forms that were never approved by or submitted to the TBI, those forms, which again is not in our context, but in that harsher context, those forms are voidable but not void. And if the insurer accepts coverage, they have to take the whole thing, the good with the bad, the policy in its entirety. And that's your argument here. They accepted coverage. There was no rescission. That's right. And again, the context is not even our context because these cases address and the cases cited by the three Texas cases cited by counsel, the Preston Daddy Money and Great American Lawyers, again, these are all cases in which they're addressing a policy form or endorsement that was never approved by TBI, never even submitted to TBI. So it's different from a reference filing issue when you're talking about a reference filing made with respect to an approved policy form. No statutory support, no case law support for that extreme position I think they're taking. Is there any indication as to the legislative intent for this reference filing? I mean, if Texas approved the form, it's got an approval date on it, why couldn't the insurance company just start writing policies on it? Well, I don't know. Why the second step? Yes, well, Texas, as Mr. Lord fully testified, Texas is one of the few states where there is a reference filing where that statute does exist. Insurance should do a reference filing after the form is approved. He never said that failure to do that voids that endorsement, which counsel is driving at. He makes that argument in a brief. Judge Winter said that she gave Mr. Lord's testimony a close reading, and he doesn't say that. It's just not in there. So that's all I have to say on Mr. Lord's purported admission. He never admitted it. He made that admission. So with respect to a reference filing, again, all the case law, not on point, addressing a different context with completely unapproved forms. Insurance also cited other case law on this issue, non-Texas case law, in which they address policy forms or endorsements never submitted to the various state insurance departments. And even there, in those cases, the courts will not void them based on whether policy reasons or the parties agreed to it, the penalties too severe to void policy for that, or the state insurance regulations do not expressly allow for it, as the Texas regulations do not. One would assume the basis for this second step would be so that insurance companies can't run amok, if you will, or abuse the process with their clients, correct? With the insurance. That question, I don't want to be the court on that. That would be Mr. Lord's testimony. Counsel may have asked him why Texas and a few states have that requirement. I can't recall what Mr. Lord said, except that it just does exist for a few states, or if it was, to be honest. So I don't know if I can go there. I mean, why that exists. Most states do not have it, though, as Mr. Lord testified. Well, I guess my question would be, if they cared enough to put the second step in, why is it not essential that the insurance companies follow that or comply with that? Well, I'm not arguing that insurance companies should not comply with it. I'm just saying that in a case in which it's not done, that there's no support for voiding the endorsement policy. That's all I'm saying, that it's much too severe. There's no support in statute. There's no support in case law. And, again, since per EURESA, you have to take the good with the bad. You can't void the entire policy. That's moving on to the second primary policy. And, again, there's no dispute that the policy wording this time was submitted to the TDI. They approved it, and then we issued the reference on it for that wording. Same exact exclusion. So there's no reduction in scope in the second one because, as a court found, there's no reduction in scope in the first one, so the whole argument is moot. But it's also, the court didn't say, it's just entirely a logical argument, since, as insurers have argued, every primary policy ever issued to our insured team supply, beginning in 2006, had the violation of statute exclusion. There was never a period when it wasn't there. Even for the two primary policies that predate the two that issue in this matter, and are not at issue, they contain the exact same violation of statute exclusion, as well as every primary policy contained a separate advisory notice to policyholders pointing out the violation of statute exclusion. It was a bargain for element in every primary policy ever sold to King Supply by insurers. Would you agree that if all the policies that King had purchased up until 2008-9 had that exclusion, and then the 08-09, for whatever reason, it wasn't in there? Not that it wasn't approved and all this stuff, it just wasn't in there. And then 9-10, it's in there again. Would you agree that then some notice, specific notice, would have to be given? You know, in that context where it just doesn't appear in one policy. You know, counsel have made the same argument in the context where you have policies that don't have it. And then the endorsement appeared around 2006-07, then it appears. And they made that argument with respect to that first appearance, that there was lack of notice under whatever state regulatory statute. And I don't know if they actually lost that argument in the Woodville nursing case in their first district here. In that context, there's some logic behind it. But where you have policies moving, whether it has it and then one doesn't, if that one doesn't, I would argue that that's almost a windfall for the insurer, since it was a bargain for it. King Supply clearly expected the endorsement to be in every primary policy and every umbrella policy. So if by chance it's not there or found to be non-applicable, it has no effect whatsoever on following policies. It's not that context where the first year it appears and you're arguing lack of notice. This is not that case. And all the case law cited by counsel on that second policy, entirely on point, it only addresses Texas's renewal rule, which every state has really, that a renewal policy will be considered to have the same coverage unless the insurer's given notice of the reduction. But again, how could that fit in this case when every policy had the exclusion? And King Supply knew and expected and factored into the premium, I'm sure, that that exclusion was there. So completely off point. I feel I should rehabilitate my witnesses somewhat since Mr. Lord's testimony has been attacked and was attacked in the brief. Judge Winter correctly found that both Charlie Lord and Katie Wilson were more than competent to testify on the two issues. She testified on the relationship between, the contractual relationship between insurers and ISO with respect to the agency argument that is made in briefs, which counsel did not really raise here in argument, and Charlie Lord on the Texas approval process itself. And Charlie Lord, underwriting consulting director, 21 years. The judge said he's clearly one of the people who handled the approval of forms used in insurers' GAO line of business. How are we reviewing Judge Winter's judgment here? What's our standard of review? Well, in terms of, I think in terms of my understanding is if you're looking at her interpretation of the law, it would be de novo. But I mean, I hesitate to go further. About the witnesses, the credibility of the witnesses, the testimony that was presented before her. I think I think that would be more of an abuse of discretion with respect. That's evidence that was accepted down below by by by the trier fact. And I think that's a different thing from looking as to whether Justice Winter's interpretation of Euresia is correct. So that would be no credibility is whether any reasonable person would agree with the trial court's decision on abuse of discretion. Well, that's a timely beat. I was coming through my notes. That's right, because I said I had more to say, but I cut a lot of that first argument. I'm going to wrap up counsel. Yeah. So thank you, Your Honor. And respectfully ask that this court from Judge Winter's order into the card. Thank you. Thank you, Your Honor. I will be really quick. I have a couple of bullet points I want to touch upon for things that were asked for. The court hit on a critical point that I neglected to talk about in my first presentation, which is that credibility was assessed on summary judgment. That's not appropriate. And that in and of itself was a mistake and should be rectified by a reversal. Credibility of the witness is not something that should be determined by the trial court on summary judgment. The gap in endorsement question. Mr. Justice Burke, you asked the question of if you had for several years the policy that didn't have an endorsement, then it popped back in. I would say absolutely positively under established law, they would have to give notice because it is from one year to the next in renewal with a different coverage term that reduces coverage. And they would have an obligation to notify their insurer of that reduction in coverage, even though in prior years before the gap year, that term was in the policy. Each policy is reviewed on its own. So I would respectfully submit that that was the answer to that question. In terms of Mr. Lord's testimony, I didn't ask him for the legislative history. I can attest to that because I took that position. But what he did testify when we were talking about the so-called reference filing, I asked him when was the form approved for use in Texas or as of what date is it approved for use in Texas? And his answer was ISO does not establish an effective date for the state of Texas. Question, how is that done? Answer, the insurer chooses to establish its effective date. Question, in order to obtain an effective date from the Texas regulatory authorities, you would have had to make a similar filing for the violation of statute's endorsement. Answer, the insurers would have to make a filing to determine the effective date of the usage for all of the forms in that filing. Yes. Justice Shostak, you hit the point. That second step has to mean something. And I know that counsel has used the term technicality. I think that's a red herring. Calling a rule a technicality doesn't make it a rule. It's still a rule and it has to mean something and it has to have an effect. What if the form is approved but not effective? And that's what very well may have happened here. They can't find the documents to show the effective date, but they at least arguably have shown documents to show that it was approved generally by TDI. So if something is approved with no effective date, does that mean it's void? It means that they cannot use it until it has an effective date. So is that the whole entire clause? The case law talks about things that aren't approved by TDI. I agree with you. I did not find any case law in point. That is the admission of their individual who was proffered to testify about this process and the requirements in their practice and procedure. And I just read you his testimony, which is that they would have to make this filing date in order to reference filing. Excuse me. Rushing. The reference filing in order to establish when it's approved for use in Texas. Because they didn't make it or at least haven't proven that they made it. It was not yet approved for use in Texas as of a particular date, and their use was improper. But the statute doesn't say what the penalty would be or what the outcome would be should that not, that step not be taken. The statute does not say that. It's silent. It's silent. Okay. Should this case be formally in trial court, would the insurer be stopped from raising policy defenses based upon its duty, its breach of its duty to defend? If the court ultimately rules that the exclusion did not apply in either of the policies, either the 0809 or the 0909. Well, if it doesn't rule in the 0809, as you pointed out, the 09010 becomes a non-issue. But the short answer is if the exclusion doesn't apply, they had a duty to defend, they breached it, and then we would argue that estoppel applies as a result. Under Illinois law? Under Illinois law. What about Texas law? Texas law does not apply the same estoppel rule under ELCO as in Illinois law. So what? And that's why I said I would argue when we return to the trial court, and I think the trial court would have to make a choice of law determination. At that point, we have argued, and I think you've heard us make arguments, that when the duty to defend is executed in the state of Illinois, the policy of Illinois, as reflected in ELCO, requires that the repercussions of breach also apply in Illinois law. And with that, I would thank the court for its time, and I would respectfully ask that the matter be reversed and remanded for further proceedings in the trial court. Thank you. Thank you, gentlemen. Thank you for your most intelligent argument. We will take this case under consideration and run our decision in due course. Court is adjourned for the day. Thank you. Safe travels back.